Good morning, Your Honors. Good morning. I'd like to make a general hearing for the balance in this case. In this particular case, Your Honor, the facts are an Armenian couple who came here fleeing their country because of persecution that they endured due to their political opinion and their activities. The case was heard in Los Angeles, and an immigration judge made a decision, concluding that the lead respondent, who was the only testifying party, was not credible. The papers that were submitted and the arguments in this case are such that, and our position is that the credibility finding is clearly erroneous in this case, and the reasons are that even though the judge cited a number of reasons, her reasons were not cogent, were not specific, and in some cases speculative, and based on her own personal hypothecation, and she injected her own view of the facts. That was Judge Hull, was it? No, Judge. That was Judge Bronzina. Bronzina? Yes, Your Honor. Now, counsel, what is the standard of review as we relate to this credibility finding? This is a pre-real ID act, and the standard of review is that in this particular case as to credibility. As to credibility is that the, is it more likely than not, and what would the court? Isn't the standard that we're looking for substantial evidence in the record to sustain what the I.J. found? Yes, Your Honor. That is correct. And the I.J., as I understand it, the I.J. said that the reason that they didn't find or the I.J. didn't find the person credible, one of those reasons was that they never mentioned a car burning until a hearing, that there was an application that was filed, there was a statement that was filed for the hearing, and the application for asylum and the statement to be filed, there was nothing ever said about a car burning, nothing ever, ever suggested until we get to the hearing, and that that was one of the reasons. And, of course, the law suggests that just because you don't put it in those two things doesn't necessarily, if that was all we had, mean that we could find a credibility problem. But that was the first one. And then the next one was passport. They say they were going to be killed. They say they were in very big trouble with the government, and yet they got a passport in a month, and that didn't seem very credible. And, of course, we can't find only on that that that doesn't make somebody credible, because there are times when you can do that. In fact, the case law suggests it. And the next one was the education problem. The application says that he's a clerk. Testimony says he's more than a clerk, he's a lawyer. The documents say he only has a high school education. Then he goes organizing the rally. He says he's the organizer of the rally, and yet 30 were arrested and he wasn't arrested, and they just told him to quit doing it. Then who told him to stop, whether it was the arm of the government or whether it wasn't, and he had several different explanations. And who got the wages, he had different explanations. Now, if I'm looking at substantial evidence, it seems to me those go to the heart of the problem, and that's substantial evidence. And even if I disagree, which I might disagree, how do I overcome this? Well, Your Honor, I respectfully disagree with that because each of these incidents can be explained. The vehicle, as Your Honor has indicated, the car bombing. Well, the question is not whether it can be explained in a way you want to explain it. The question is, given the standard of review, which is substantial evidence in the record, how do we get to that? I mean, my worry is not that you don't have a good explanation because I think you're a pretty good lawyer and you can come up with one, and I look at it and I may not agree, but I can't undo it on that basis. Well, in this case, Your Honor, we have to rely on the record. But the judge, the way she did this hearing from the beginning and throughout, it was so flawed. Her reasoning was so deficient that if we just look at the four corners of this record, itself is the basis for which this appeal is presented. Now, you suggest in your particular situation, in reading your brief, that there's somehow a due process violation. Is this what you're talking about, this credibility finding? The due process aspect was not really flushed out. I'm not the one who prepared the brief, Judge, but that's all. So there is no mention about what it is, or is this it? The due process, that plus the fact that the judge, the way she held her hearing, and the way she argued with the respondent. So you're really saying then that the due process argument you were trying to raise had to do with the way the judge conducted the hearing? More so in that particular point, yes. And you understand that because you really didn't waive that or raise that in your brief, your opening brief, that that's waived? I'm aware of that, Judge. Okay. Let me ask you a couple questions. Yes, Your Honor. Now, his lawyer was Zeckham, right? Yes, the judge. Are you connected with him in any way? No, Your Honor. Huh? No, Your Honor. Are you a part of his office? No, Your Honor. Are you part of his operation? No, Your Honor. All right. Now, where is he now? I cannot answer that, Judge. Okay. After the case. I know we've had a lot of experience with him. Now, did you make a claim here of ineffective assistance of counsel? Your Honor, if I can just give you a little history as to that. Tell me the history. No. The history in this case is that from what I've read is that Mr. Zeckhamian handled the initial hearing in the immigration court. Yeah. Then another attorney, Mr. Yepremian, was retained to do the appeal before this court. Yeah. And I have been retained to do the oral argument here, Your Honor. I am not associated with any of the firms previously mentioned. How about the other guy? Are you associated with him? No. What's his name? Ukrainian? No, sir. I am not. Yeah. I had my own office. And unfortunately, I got involved in very late. But I cannot comment as to what Mr. Oregian did as far as finding any type of lazada or any type of ineffective counsel claim. The judge mentions it. I know. I know. We have a lot of problems with the lawyers that come here and represent the Armenian community. You know that? We have good lawyers and we have lawyers that are not good lawyers. And that's true across the board in this area. I hope that does not make your – No, no. I'm not looking at you. I hope it does not make a reflection on the community as a whole. No, no. Well, listen, you can talk to some of my friends who were on the bench and they'll tell you the same thing who are Armenians. And I grew up in an Armenian community in East L.A. And so we've got problems with them. You know, you've got problems with people who are acting in the capacity of lawyers or paralegals who are not, who are incompetent, who take people's money. Now, who filled out this application? Who filled out this application for Mr. Oregian? I personally don't know, Judge. At the signature line, I did see that there was an individual's name. I cannot – Who filled it out. I'm sorry? Who filled it out. Yes, who filled it out. I don't know what or in what capacity was this individual – Yeah, and that's not uncommon when you go to one of these people there who act in the role of whether it's a notorio or whatever. They don't, they just, they just, it's a person who's not trained in the law. They sit down, they take notes, and they fill it out themselves for the person. All I can say, Judge, is that – I'm not, you know, you know about that. I'm very aware. I'm embarrassed. I'm all aware of it. I'm embarrassed too. And now, was he given an opportunity to give an explanation about the car burning? In the court proceeding? In the court proceeding. From what I read the record, no. Isaacian was there that he say – No, no. That he asked him, well, why was that left out? And, you know, was he given an opportunity to explain? No, Judge. He was not. Yeah. He was not. Isaacian had a hand in preparing this application. Well, the immigration judge does allude and make some comments that perhaps there may be some ineffective counsel issues. But I don't know, Judge, the connection between the preparer and a law firm or the preparer and Mr. Zakanian. I do not know that. But it just appears that in court he mentions it and the issue of the car burning is not flushed out. Wasn't there a problem with the translator in this case, too? Yes, Your Honor. There was. It appears from what Mr. Regan says that there was an issue about the translator. And to Judge Smith's comment as far as the issue about a lawyer. Judge Preggison mentioned the one thing that – I'm trying to find my notes here on Isaacian. And I can't find them here. But as I recall, he's been on our court's watch list for some time. But I'll have to find that. But – Judge Collins, what I was trying to say earlier.  I'm sorry. Was he acting, O'Janian, your client, acting in the role of a lawyer? Your Honor, this is – my position is today that in the Armenian language, lawyer can be interpreted in three different or by three different words. All right. So I wish I had had access to the tapes from the hearing. Because our position is that it is not correct what the judge said in her decision. The gentleman, Mr. Regan, did mention in his asylum application that he had gone to law school. Not only to high school. Secondly, our position is that if the word that was mentioned in the immigration court was that of an advocate, that's one way of saying Armenian, Judge Collins. So when it comes to the issue of interpretation, maybe that was it. He does mention that he was – Here, if you're a notary, you just have to pass a test, get a license, and you get a seal, and you can be a notary. But my understanding is in Mexico, if you're a notario, you're some kind of a quasi-judicial officer. It's a high position. And it's possible that in Armenia, especially since this individual worked for this human rights organization, in that capacity, he perhaps was, even though he had not graduated from law school, he was working as an advocate on behalf of the people trying to help them with resolving their issues of earnings with the government. Wages. But there was, to your response here, Judge Collins, there was an issue at the various stages of this asylum case, an issue with the interpreter. I just want to make it clear. I'm not casting aspersions on the Armenian community. My family back in the old country lived with Armenians. My father always told me we were cousins to the Armenians. I grew up with Armenians in this country. You understand that? And what upsets me is that poor people who come here and flee these terrible conditions in those countries and they get here and they have a problem and they end up in the clutches of people who don't represent them competently and take their money. Do you understand what I'm saying? Very well, Your Honor. And that goes on all over with this community, with the Latino community, with the Fijian community, and with the Russian community. It just goes on. Of course, our government doesn't do anything about it, and our government knows all about this as well. So anyway, you see how I feel about this, huh? Thank you, Your Honor. Okay. Let me ask you one more question, if I could. Yes, Judge. It seems to me that you're only appealing the decisions on asylum and withholding because the CAT decision is not appealed. Based on the briefs, I can't find anything about the CAT finding appealing that. It was my understanding that at the initial, when Mr. Isakhanian did the brief before the BIA,  That was before the BIA? Yes, Your Honor. Is it mentioned any place in your briefs to me, to this Court? I'm sorry, I cannot. I mean, your brief says the IJ and the BIA erred in denying petitions request for asylum and withholding of removal due to lack of credibility. That's all it says. Yes, Your Honor. I have read that. Okay. Now, you mentioned that your client worked for a human rights organization in Armenia. That is correct, Your Honor. And it was called the Armenian Center. And their job was to see that people who worked and weren't paid would get their wages. That's correct. All right. And then the organization started taking 30% off the top, and he didn't like it. So he got involved in a protest against the government and the Armenian Center's new policy. This is in Yerevan, right? Yes, Your Honor. Okay. And then he was told by his manager, who worked for the government, and his life was threatened, and that the secret police were following him, and he got threatening phone calls. He'd be killed, and his car was burned, and he got slapped around and locked in prison. Home was searched. Papers were stolen. That's all part of his testimony, right? That is correct, both oral as well as... And he had to move from place to place, and he obtained a visa. He came here with his wife, and they have two children that were born in this country. U.S. citizens. U.S. citizens. Okay. And the I.J. found he was not a credible witness. And as far as Azbek Isakian is concerned, we currently have 10 disciplinary watches on him, on our watch report. And so he's not one of our star performers. So this is a lot of other stuff. Did you know any of that? Which part, Judge? I knew about the... Isakian. Judge, I'm aware. I'm aware of certain things, because both from the court as well as within the... You know Judge Trevisan, don't you? Of course, Judge. He's my close friend. You ask him about what's going on over there. Judge, I don't have to. I'm in the community. You know it. I know very well. And unfortunately, it affects lawyers that appear on a regular basis in front of the court. I know, I know. It does. It does. It's terrible. But the system does have a method of cleaning itself. It may take time. Well, I'm 85. I don't think I'll see it while I'm around. Well, Judge. Yeah. That's why I'm working a little faster. Okay. Thank you. Thank you, Your Honor. Good morning. Thank you. May it please the Court, Sarah Maloney for the respondent. The only issue raised before the Board of Immigration Appeals and before this Court is whether substantial evidence supports the adverse credibility finding. The record evidence does not compel the conclusion that any of Petitioner's versions of events must be believed. As the immigration judge found, the claim Petitioner asserted on a sworn asylum application is entirely different than the claim about which he testified. In his application, the petitioner claimed he was represented by an attorney before the immigration judge. Yeah, but you got an attorney here who's, I don't think it would be hard to make a finding that he's incompetent. You know, I mean, have you checked on him? Excuse me? Have you checked on him? Have I checked whether his attorney was incompetent? Yeah. No, I haven't. The issue wasn't raised in the brief, sir, before the Board. Well, you know, you can be a disbarred lawyer in practice before the immigration judge. That's allowed, isn't it? I'm unsure. Yeah. Well, it is. And so we've got big problems in our country. We're hurting a lot of people and a lot of children, too. But anyway, go ahead. Well, the petitioner claimed he was employed as an office clerk for a human rights organization on his asylum application. He claimed the organization collected back wages for private sector workers and that when the organization began retaining 30 percent of the wages for itself, he complained and the head of the organization threatened him. He claimed that the workers rioted when they learned that they were only receiving 70 percent of their wages. He was present at the riot. The head of this human rights organization saw him, threatened him. The organization proceeded to search his house. And so he fled Armenia to come to the United States and apply for asylum. In contrast, during his testimony, he claimed that he worked as an attorney and volunteered for a human rights organization where his role was to organize demonstrations against the government. He claimed he organized a demonstration against the government where between 1,000 and 1,500 people attended. The police stopped the demonstration. Many participants were arrested, but they didn't arrest the petitioner. They merely cautioned him to stop organizing these demonstrations. He said the government then proceeded to threaten him, search his home, and burned his car, all on account of him having organized this big demonstration. So he fled Armenia, came to the United States, and applied for asylum. The petitioner was unable to compellingly reconcile any of these inconsistencies during his testimony, and the Court therefore should deny the petition for review. Isn't it true that in most cases he wasn't given a chance to explain the difference between his oral testimony and his written application?  He was given an opportunity to explain. And in fact, to end point, at the transcript on page 94, the immigration judge asked the petitioner why he didn't tell his attorney that his whole claim was different than that which would have appeared on his asylum application. Is that before the conversation with the I.G. and the attorney about whether or not he'd gone over the application with the guy before he filed it? I'm sorry? Isn't there some conversation also with the I.G. and the lawyer about whether he discussed the application with his client before it was filed? Yes. And the client only spoke Armenian, didn't read English, and the application was in English? Yes, but the attorney speaks Armenian and civilian. Didn't the attorney admit that he hadn't gone over the application with him? At one point he did, but then later he changed his story as well. After the I.G. suggested that he might want to do so? Yeah. However, the – You wouldn't do a thing like that, now, would you? That's about the way he said it. But the Petitioner testified that he didn't want to make the correction because the whole meeting was telling – talking to one person and it just wouldn't change anything. Now, while the – Is that when he was talking about having problems with the translator? Telling his – the immigration judge asked him, why didn't you tell your attorney that, you know, your asylum claim that you've – that you've written here, your application, is different from your – from the – you know, from your – from what happened? And Petitioner responded, I didn't make the correction because the whole meeting was telling one person and it wouldn't change anything. Maybe he meant that I kept telling them what was going on. They kept writing what they wanted to write anyway. But he didn't say that. Maybe that's what he meant, but this evidence doesn't compel the conclusion that that's what he meant. And under the substantial evidence standard of review, this essentially fails. The IJKian admitted that he – he admitted he didn't review this application and documents with Orjanian prior to his – to his hearing. He said that. There were some varying responses from his attorney during that discussion with the IJ. However, there was no ineffective assistance of counsel claim raised on appeal and there was none raised to this Court. There's none raised in the motion to reopen. Since that issue. Who filed that brief? Who filed the appeal brief to the board? Yeah. Did he file the brief to the board, too? The same lawyer? It's a – let's see here. Yes. In fact, well – I'd like to raise his own ineffective assistance issue. Well, his – but his client knew that his asylum application had been denied because there were – there were major discrepancies between his application and his – and his testimony. Therefore, his client was on notice that if, in fact, he believed it was his attorney's fault and not his own, that, you know, perhaps he was receiving ineffective assistance. I'm pretty sure the IJ made that perfectly clear to him, right? He had – there was a translator at the hearing and the immigration judge provided an oral – the same oral decision that you've read the transcript of. But, you know, sometimes you get a translator at a hearing who speaks a different dialect of Armenian than the person who's the – who's the, you know, the applicant. There's no indication that that's the case here. I know, but that happens, you know. You might get an Armenian from Yerevan and the translator is an Armenian from Egypt, you know. So I've had a lot of experience with this. I'm not saying it happened here, but, you know, a lot of times these translators, they take a shot in the dark, too. They argue with each other. I've had them where two translators are arguing with each other. All right. Well, I guess unless there are any further questions. Thank you. Thank you. All right. I think we've used up your time. It matters a little. Okay. Now we come to Pedroza versus National Steel and Shipping Company. Thank you.
judges: Pregerson, Smith, Collins